**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

---

ESTATE OF VICTOR GARCIA,
by and through its Special Administrator
Susan Garcia,

*Plaintiff,*

v. **Case No.:** 26-cv-1018

WISCONSIN DEPARTMENT OF CORRECTIONS;
STEVEN P. SPICE,
in his individual capacity;
ANWAR F. SAID,
in his individual capacity;
CHASTITY A. DRAKE,
in her individual capacity; and
STEVEN M. LATURI,
in his individual capacity,

*Defendants.*

---

# COMPLAINT

---

NOW COMES Plaintiff, the Estate of Victor Garcia, by and through its Special Administrator, Susan Garcia, and by and through undersigned counsel, and for its Complaint against Defendants Wisconsin Department of Corrections, Chastity A. Drake, Steven P. Spice, Anwar F. Said, and Steven M. Laturi, alleges as follows:

## JURISDICTION AND VENUE

1. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, 42 U.S.C. § 12132, and 29 U.S.C. § 794.

2. Plaintiff asserts claims for violations of Mr. Victor Garcia's rights under the Eighth Amendment to the United States Constitution, including the right to be free from deliberate indifference to serious medical needs and a substantial risk of suicide while in custody.

3. Venue is proper in the United States District Court for the Western District of Wisconsin pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred at Columbia Correctional Institution in Portage, Wisconsin, which is located within this judicial district.

4. The acts and omissions of Defendants, including their failure to adequately protect and monitor Mr. Garcia while he was on clinical observation status for suicide risk, occurred within this District.

## PARTIES

5. Plaintiff, the Estate of Victor Garcia (the "Estate"), is the duly appointed legal entity authorized to bring this action on behalf of Victor Garcia, deceased.

6. Susan Garcia is the Special Administrator of the Estate of Victor Garcia and is authorized to pursue all claims on behalf of the Estate and the statutory beneficiaries under applicable law.

7. At all times relevant, Victor Garcia was an adult individual incarcerated at Columbia Correctional Institution ("CCI") in Portage, Wisconsin, and was under the custody, care, and control of the Wisconsin Department of Corrections.

8. Defendant Wisconsin Department of Corrections ("DOC") is an agency of the State of Wisconsin responsible for the operation, administration, staffing, and supervision of

correctional institutions, including Columbia Correctional Institution. At all relevant times, DOC acted under color of state law.

9. Defendant Wisconsin Department of Corrections is sued solely with respect to Plaintiff's claims under Title II of the ADA and Section 504 of the Rehabilitation Act, and not under 42 U.S.C. § 1983.

10. Defendant Steven P. Spice was, at all relevant times, a correctional officer at CCI. On July 19, 2024, Defendant Spice was assigned as the observation checker officer for the RH1 clinical observation area, where Mr. Garcia was housed on clinical observation status.

11. At all relevant times, including while assigned to observe Mr. Garcia, while responding to Defendant Drake's inquiry about the threat statement, and while responding after Mr. Garcia was found in the observation shower, Defendant Spice was carrying out duties assigned to him by DOC as a correctional officer and was acting within the scope of his employment with DOC. He is sued in his individual capacity.

12. Defendant Anwar F. Said was, at all relevant times, a correctional officer at CCI assigned to RH1. On July 19, 2024, Defendant Said participated in escorting Mr. Garcia from his observation cell to the RH1 clinical observation shower and handled the restraint tether used in that escort.

13. At all relevant times, including while performing observation checks of Mr. Garcia on July 17 and July 18, 2024, and while escorting Mr. Garcia to the observation shower, removing his restraints, and handling the restraint tether on July 19, 2024, Defendant Said was carrying out duties assigned to him by DOC as a correctional officer and was acting within the scope of his employment with DOC. He is sued in his individual capacity.

14. Defendant Chastity A. Drake, M.S., was, at all relevant times, a Psychological Associate in the Psychological Services Unit ("PSU") at CCI responsible for evaluating inmates' mental health status and determining appropriate observation levels and suicide precautions. Defendant Drake personally evaluated Victor Garcia on July 17 and July 19, 2024, and was present in the clinical observation area of CCI's Restrictive Housing Unit 1 ("RH1") on the afternoon of July 19, 2024.

15. At all relevant times, including during Mr. Garcia's January 26, 2024 arrival safety assessment, her July 17 and July 19, 2024 clinical observation reviews, and her response on July 19, 2024, Defendant Drake was performing duties assigned by DOC as a Psychological Associate and acting within the scope of her employment with DOC. She is sued in her individual capacity.

16. Defendant Steven M. Laturi was, at all relevant times, a lieutenant (Supervising Officer 1) at CCI. On July 19, 2024, Defendant Laturi was the on-duty shift supervisor, with supervisory authority over the security staff working in RH1, including the RH1 clinical observation area. He personally supervised and participated in the escort of Mr. Garcia to the observation shower.

17. At all relevant times, including while escorting Mr. Garcia to the observation shower, while supervising RH1 security staff, and while receiving and responding to radio calls concerning the emergency in the observation area on July 19, 2024, Defendant Laturi was carrying out duties assigned to him by DOC as a lieutenant and shift supervisor and was acting within the scope of his employment with DOC. He is sued in his individual capacity.

18. Defendants Drake, Spice, Said, and Laturi (collectively, the "Individual Defendants") are each sued in his or her individual capacity for damages. At all relevant times, each Individual Defendant was an employee of the Wisconsin Department of Corrections, acting under color of state law and within the scope of his or her employment.

19. Every act and omission of each Individual Defendant alleged in this Complaint, including each of his or her interactions with Mr. Garcia, occurred while that Defendant was on duty at CCI, carrying out duties assigned by DOC, and acting within the scope of his or her employment with DOC. No Individual Defendant acted for purely personal reasons unrelated to his or her DOC employment.

**Indemnification Under Wis. Stat. § 895.46**

20. Wisconsin Statute § 895.46(1)(a) provides that "[i]f the defendant in any action or special proceeding is a public officer or employee and is proceeded against in an official capacity or is proceeded against as an individual because of acts committed while carrying out duties as an officer or employee and the jury or the court finds that the defendant was acting within the scope of employment, the judgment as to damages and costs entered against the officer or employee, except as provided in s. 146.89(4), in excess of any insurance applicable to the officer or employee shall be paid by the state or political subdivision of which the defendant is an officer or employee."

21. Each Individual Defendant was, at all relevant times, an employee of the State of Wisconsin through DOC, and each was acting within the scope of his or her employment in every act and omission alleged in this Complaint. Accordingly, the State of Wisconsin is obligated under Wis. Stat. § 895.46(1)(a) to pay any judgment for damages and costs entered against any Individual Defendant in this action.

22. Plaintiff does not assert a claim against the State of Wisconsin in this action. These allegations identify the State's statutory obligation to pay any judgment entered against the Individual Defendants, and Plaintiff will ask the jury or the Court to find that each Individual Defendant acted within the scope of his or her employment.

## STATEMENT OF THE RELEVANT FACTS

### Background and Custody Status

23. Victor Garcia was an inmate in the custody of the Wisconsin Department of Corrections and, at all relevant times, was housed at Columbia Correctional Institution ("CCI").

### Documented History of Suicidal Behavior at FLCI

24. Prior to his transfer to CCI, Mr. Garcia was housed at Fox Lake Correctional Institution ("FLCI"), where he repeatedly engaged in suicidal behavior, made explicit threats of self-harm, and required intervention by staff and placement on observation status. These events were documented in official DOC incident and conduct reports and were known to DOC personnel.

25. In March 2023, while housed at FLCI, Mr. Garcia reported that he attempted suicide by overdosing on medication and expressed ongoing distress related to untreated medical pain and institutional conditions.

26. On April 17, 2023, at approximately 12:52 p.m, Mr. Garcia climbed a recreation pen fence, secured a bed sheet around his neck, and attempted to suspend himself, requiring emergency intervention by multiple staff members to cut him down and prevent his death. Following this attempt, Mr. Garcia was placed in restraints and subsequently returned to observation status.

27. In addition to this hanging attempt, records from FLCI document that Mr. Garcia repeatedly expressed suicidal ideation and threats of self-harm to both correctional and medical staff. For example, on May 26, 2023, Mr. Garcia reported that he intended to "hurt himself," prompting referral to psychological services and intervention by health services staff.

28. These demonstrate that Mr. Garcia's suicidal ideation was persistent, escalating, and directly communicated to DOC staff, including both security and medical personnel, well before his transfer to CCI.

**Escalating Suicide Risk and Institutional Notice**

29. On December 11, 2023, while housed at FLCI, Mr. Garcia was placed in clinical observation after telling staff that he planned to kill himself by cutting his vein or hanging himself.

30. On December 16, 2023, while still on observation status, Mr. Garcia broke a piece of plastic from the camera in his cell and used it to cut himself, requiring staff intervention.

31. Throughout 2023 and into 2024, Mr. Garcia repeatedly filed complaints and communicated concerns regarding his safety, mental health, and the failure of staff to protect him from self-harm or provide adequate care.

    a. He complained that he had a medical emergency and needed to see PSU. He specifically stated, "I want to kill myself," and when asked how, he replied that he did not know and just wanted to see PSU.

    b. He complained that his knee surgery had been canceled and that he had been told it would not be rescheduled.

    c. He complained that his pain medication had been removed.

d. He reported that he had been in serious knee pain for nearly two years and that his knee required surgery.

e. He stated that he had attempted suicide on March 11, 2023 by overdosing on acetaminophen.

f. He complained that after that suicide attempt, he was placed on observation status, and that HSU had removed him from acetaminophen, after which he wrote HSU asking about both his surgery and his pain medication.

g. In his inmate complaint/appeal, he complained that the incident reports from other officers contradicted the reporting officer's narrative and would have shown that he was suicidal and that his actions were directly related to the self-harm incident.

h. He complained that Captain Bovee's finding of guilt violated DAI policy 303.00.04(3)(c) because he was attempting to commit suicide by hanging.

i. He complained that Dr. Williams's 4/17/2023 observation placement report would have clearly established that he was placed on observation because he was suicidal, and that refusal to allow that report at the hearing violated his due process.

32. These events were documented in official DOC records, including incident reports, conduct reports, psychological service notes, and medical records.

**Transfer to CCI and Defendant Drake's Prior Contact with Mr. Garcia**

33. On January 26, 2024, Mr. Garcia was transferred from FLCI to CCI on the same day he was released from clinical observation at FLCI. Defendant Drake personally conducted Mr. Garcia's arrival safety assessment at CCI that day. During that assessment, Mr.

Garcia raised the subject of hanging, telling Defendant Drake: “I didn’t try to hang myself, I just said it.”

34. Mr. Garcia's PSU record, which was available to Defendant Drake at CCI, documented that on April 17, 2023, he had been placed in clinical observation "following an attempt to hang himself by placing a ligature on his neck."

**Clinical Observation Placement and Repeated Self-Harm (July 8–19, 2024)**

35. On July 8, 2024, Mr. Garcia was placed on clinical observation status after he reported feeling suicidal and refused to recant those statements. The stated reason for placement was that Mr. Garcia was “dangerous to self.”

36. DOC's Observation Record (DOC-112) requires that inmates on clinical observation be observed at staggered intervals not to exceed 15 minutes.

37. Although Mr. Garcia remained on clinical observation through July 19, 2024, the observation logs produced in this case, covering the period from July 8 through July 18, 2024, contain no observation-check entries for July 19, 2024, the date of the ligature incident.

38. The absence of observation entries for that date is significant, given that DOC policy required staggered observation checks at intervals not to exceed fifteen (15) minutes. The lack of documentation reflects that no observation checks were recorded during the critical period leading up to the incident.

39. Throughout the placement, Mr. Garcia frequently refused to engage with psychological staff during clinical reviews.

40. On July 13, 2024 at approximately 23:45, staff responded to Mr. Garcia engaging in active self-harm inside his observation cell. Upon arrival, staff observed Mr. Garcia with blood dripping from his hands and blood on the floor.

41. During this incident, Mr. Garcia repeatedly stated that he "want[ed] to die."

42. Correctional staff restrained Mr. Garcia for escort to the HSU triage room, including with handcuffs and a tether, while he was actively suicidal. Staff documented removing the restraints, including the tether, when Mr. Garcia was returned to his cell. Restraint tethers were thus routinely used when Mr. Garcia was moved in and out of his observation cell.

43. Mr. Garcia was transported to the Health Services Unit for evaluation and then returned to his observation cell without any change in placement.

44. On July 14, 2024 at approximately 9:35 a.m., staff again responded to Mr. Garcia after observing that he was bleeding from a reopened wound.

45. Mr. Garcia was removed from his cell, treated, and returned to clinical observation without any escalation in supervision or intervention.

46. Psychological staff were notified of these incidents, and Mr. Garcia remained in observation status.

47. On July 15, 2024, Mr. Garcia told a PSU psychologist that he did not feel safe to leave clinical observation. The psychologist documented that he "was still having active thoughts to kill himself."

48. On July 16, 2024, Mr. Garcia told PSU psychologists Dr. Marcelo Trinidad and Dr. Courtney Schmidt that he had thoughts, plans, and intent to engage in self-directed violence, stating: "Yes, I want to do it and I am absolutely capable of doing it. I just need to find the easiest and less painful way. I am fine with death. Death is easy. I just don't

want to suffer. I want to die quickly." Dr. Trinidad documented that Mr. Garcia's "desire, intent and capability were self-described as high."

49. Dr. Trinidad further documented that other PSU team members had recommended exploring a stabilization referral to the Wisconsin Resource Center ("WRC") and that the PSU supervisor had agreed to follow up. Mr. Garcia was not transferred for stabilization before July 19, 2024; he remained in the same clinical observation placement at CCI.

50. On July 17, 2024, Defendant Drake conducted a clinical observation review of Mr. Garcia. She documented that it was "unclear if he is safe and future oriented" and that "[t]he estimated acute risk to engage in self-directed violence remains elevated."

51. Before her July 17 and July 19 reviews, Defendant Drake documented that she "reviewed documentation available." Upon information and belief, that documentation included the July 13-16 records described above.

**Clinical Confirmation of Elevated Suicide Risk (July 19, 2024)**

52. On July 19, 2024 at approximately 9:15 a.m., Defendant Chastity A. Drake, Psychological Associate, conducted a clinical observation review.

53. During that review, Mr. Garcia again refused to engage with staff.

54. Defendant Drake documented that: It was "unclear if he is safe and future oriented." His "acute risk to engage in self-directed violence remains elevated," and clinical observation for close monitoring was "the least restrictive option available for safety."

55. Based on this assessment, Mr. Garcia remained on close observation with 15-minute checks due to ongoing suicide risk.

56. Thus, as of the morning of July 19, 2024, Defendant Drake had actual, contemporaneous knowledge that Mr. Garcia was at an acute and ongoing risk of suicide, as well as

knowledge of his extensive history of suicide attempts, including prior attempts by hanging, documented within DOC records. Each Individual Defendant who worked in the RH1 clinical observation area that day knew that Mr. Garcia was on clinical observation status because he was dangerous to himself.

**The Shower Escort and the Tether**

57. In the early afternoon of July 19, 2024, Mr. Garcia was removed from observation cell 47 and escorted to the RH1 clinical observation shower. The escort was conducted by Defendant Laturi, the on-duty shift supervisor, together with Defendant Said and Correctional Officer Tyler Peterson.

58. During the escort, Mr. Garcia's wrists were restrained and a restraint tether was attached to the restraints. According to DOC's own incident report, after Mr. Garcia was placed inside the shower and the door was closed, Defendant Said removed both the wrist restraints and the tether.

59. Yet when Mr. Garcia was found, a restraint tether was wrapped around his neck, and both ends of it were fastened to the shower door.

60. Upon information and belief, Defendant Said did not remove the tether from the shower area. Instead, he left it fastened to the shower door, within Mr. Garcia's reach from inside the shower. In the alternative, if Defendant Said did remove the tether, a tether was returned to or left at the shower door by another staff member before Mr. Garcia was found. Either way, a known ligature was left within reach of a prisoner on suicide observation.

61. Defendant Said knew that Mr. Garcia was on clinical observation status for suicide risk. He was moving Mr. Garcia from an observation cell to the observation shower within the

clinical observation area, and the DOC-112 records bear the name "Said" as the officer who performed Mr. Garcia's fifteen-minute observation checks on July 17 and July 18, 2024, including entries with initial "AS."

62. Defendant Laturi likewise knew that Mr. Garcia was on clinical observation status for suicide risk. He was the shift supervisor over the RH1 security staff and personally escorted Mr. Garcia out of his observation cell.

63. A restraint tether is a cord-like device that can be looped around a neck and anchored to a fixed point. Leaving a tether within reach of a prisoner on suicide observation creates an obvious ligature risk, the very risk that led DOC to limit Mr. Garcia's property to suicide-resistant clothing and a security mat. Mr. Garcia had previously attempted to hang himself with a ligature tied to a fixed structure on April 17, 2023.

64. Upon information and belief, Mr. Garcia entered the shower at approximately 2:00 p.m. EMS recorded his "Time Last Known Well" as 2:00 p.m. A correctional officer who accompanied him to the hospital reported learning that Mr. Garcia "had been in the shower for approximately 40 minutes." Hospital records document that he had been "[i]n shower for about 40 min" and that approximately "2.5 hours" had passed "since [he] entered [the] shower" when he arrived at the hospital.

**Knowledge of Imminent Suicide Risk and Failure to Intervene**

65. On the same date, July 19, 2024, Mr. Garcia was placed in the observation shower area.

66. During that time, Defendant Drake heard someone in the clinical observation area yell words to the effect that he was "going to hang" himself. This statement was not vague or ambiguous, it was a direct, explicit threat of imminent self-harm by hanging, a known and highly lethal method of suicide. Such a statement, made within the clinical

observation unit housing inmates identified as dangerous to themselves, constituted an urgent and unmistakable indicator of an immediate suicide risk requiring prompt intervention.

67. The clinical observation checker, upon information and belief, Defendant Spice, informed Defendant Drake that the statement had been made by a different PIOC and not Mr. Garcia.

68. Defendant Drake then approached the cell of the PIOC identified by staff as the individual who made the statement. That PIOC denied making any such statement.

69. After leaving that cell, Defendant Drake proceeded toward the observation shower area. While in front of the shower, Defendant Drake heard a male voice yelling that sounded similar to the voice she had heard earlier in the clinical observation unit. Mr. Garcia was the prisoner in the observation shower.

70. Despite having recently conducted a clinical observation review of Mr. Garcia earlier that same day at approximately 9:15 a.m. - during which she documented that "the estimated acute risk to engage in self-directed violence remains elevated" - Defendant Drake did not immediately intervene or verify Mr. Garcia's condition.

71. Despite hearing this specific threat, Defendant Drake did not verify whether Mr. Garcia was the source of the statement, did not conduct or direct an immediate welfare check of all inmates in the observation area, and did not implement any additional precautionary measures.

72. No one checked on Mr. Garcia following the statement.

73. Instead, Defendant Drake documented that she delayed further investigation "due to PIOC going into shower," and determined that she would follow up with the PIOC after the shower.

74. Defendant Spice, as the observation checker, knew that someone in the clinical observation area had just threatened to hang himself; upon information and belief, he was the staff member Defendant Drake asked to identify the speaker. Upon information and belief, Defendant Spice did not look in on Mr. Garcia in the shower after that threat and did not observe Mr. Garcia at staggered intervals not exceeding fifteen minutes while Mr. Garcia was in the shower.

75. Had Defendant Spice or Defendant Drake looked in on Mr. Garcia in response to the threat, or had Defendant Spice performed the required fifteen-minute checks, Mr. Garcia would have been discovered before, or promptly after, he placed the tether around his neck.

**Discovery of Mr. Garcia and the Refusal to Remove the Tether**

76. At approximately 2:30 p.m., Defendant Drake and a PSU psychologist followed Defendant Spice, the observation checker, to the observation shower to check on Mr. Garcia. They found Mr. Garcia seated on the floor with his back against the door and the tether wrapped tightly around his neck. He was unresponsive, but his abdomen was still moving.

77. Defendant Drake pounded on the door and called Mr. Garcia's name. He did not respond. Defendant Spice radioed for a supervisor. Upon information and belief, he did not call for medical staff. Defendant Drake then left to find help.

78. The psychologist asked Defendant Spice to take the tether off. He refused, stating, "I am not taking it off until a supervisor comes," and radioed again for a supervisor. The tether stayed tight around Mr. Garcia's neck while he waited.

79. Nothing prevented Defendant Spice from acting. The tether was fastened to the shower door near the trap. Minutes later, a responding staff member did exactly that, unfastening one end of the tether from the door before the door was opened.

80. Defendant Spice knew Mr. Garcia was on suicide observation. He saw him unresponsive with a tether tight around his neck, was asked to remove it, and could have done so from outside the shower. He chose to leave it in place and wait for a supervisor.

**Supervisory and Medical Response**

81. Defendant Laturi recorded hearing Defendant Spice's radio call for a supervisor to the observation area at approximately 2:40 p.m. Defendant Laturi was then handling another incident in RH1 and did not respond immediately.

82. Defendant Drake encountered Sergeant Ferstl and PSU Supervisor Dr. Kelsey Stange and alerted them. Sergeant Ferstl went to the observation shower and made another radio call for a supervisor at approximately 2:43 p.m. He then unsecured one end of the tether from the shower door, releasing its tension; radioed for HSU to report to RH1 immediately; and opened the shower door.

83. Between approximately 2:40 p.m. and 2:45 p.m., staff radio transmissions were made reporting that an inmate was in the shower with a tether around his neck and requesting supervisory response, including a call for a "[s]upervisor to RH1 immediately," followed by a call for a nurse to RH1.

84. Mr. Garcia remained unresponsive. Sergeant Ferstl and Defendant Spice placed him in wrist restraints, and Sergeant Ferstl directed Defendant Spice to retrieve a restraint chair. Defendant Spice retrieved the restraint chair, and Defendant Spice, Defendant Laturi, Sergeant Ferstl, and Officer Peterson secured Mr. Garcia in it.

85. The responding HSU nurse arrived while Mr. Garcia was being secured in the restraint chair. He checked for a pulse and directed staff to take Mr. Garcia to the RH1 HSU triage room.

86. EMS records reflect that the 911 call was received at 2:49 p.m.

87. The responding HSU nurse reported to EMS that Mr. Garcia's oxygen saturation was "originally around the 50s" when the nurse got to him. EMS further recorded that Mr. Garcia "was reported to be not breathing for a short time and was pale/blue before a BVM was used to assist his breathing."

88. EMS arrived at CCI at 2:55 p.m. and reached Mr. Garcia at 3:00 p.m. He had a Glasgow Coma Scale score of 3 and no gag reflex, and he was intubated at approximately 3:20 p.m. He left CCI at approximately 3:35 p.m. and arrived at the University of Wisconsin Hospital at approximately 4:25 p.m.

89. In sum, staff reports place Mr. Garcia's discovery at approximately 2:30 p.m.; the tether remained tight around his neck until Sergeant Ferstl released it at or after approximately 2:43 p.m.; and EMS was not summoned until 2:49 p.m. Upon information and belief, the continued compression of Mr. Garcia's neck and the delay in restoring his oxygenation during that period increased the severity of his hypoxic-anoxic brain injury.

**Catastrophic Injuries and Immediate Aftermath**

90. Following the incident, Mr. Garcia did not return to his prior baseline. Instead, he sustained catastrophic hypoxic-anoxic brain injury and entered a prolonged state of devastating neurological impairment. By the time he was transferred to Lakeview Neurorehab on September 4, 2024, his records reflected respiratory failure, ventilator dependence, anoxic brain damage, pneumonia, seizure-related complications, and the need for a tracheostomy and gastrostomy tube. Lakeview's admission history described him as a Level I trauma patient who had been found hanging, was intubated in the field with a Glasgow Coma Scale of 3, and remained nonresponsive after the event.

**Prolonged Suffering and Medical Decline**

91. Mr. Garcia's suffering was not limited to unconsciousness alone. He remained non-verbal, non-responsive, and ventilator-dependent, with profound neurocognitive deficits from anoxic brain injury. Providers repeatedly documented posturing, post-hypoxic myoclonus, agitation, severe intermittent contractures, dysphagia, cognitive-communication deficits, muscle weakness, increased secretions, and seizure disorder.

92. His condition required continuous tube feeding, tracheostomy care, seizure medications, muscle relaxants, and repeated administration of IV midazolam and narcotic pain medication.

93. Treating providers also documented that his prognosis was "very poor" or "poor," that there had been no meaningful neurological improvement, and that his family was pursuing compassionate release and considering hospice care.

**Severe Medical Complications During Survival Period**

94. Mr. Garcia also experienced serious medical complications during this period of survival. While at Lakeview, he developed worsening respiratory distress and was emergently transferred out on October 11, 2024, after staff observed increased work of breathing, tachypnea, difficulty with ventilation, and increased agitation.

95. He was then found to have a right-sided pneumothorax and was also treated for suspected sepsis of unclear origin before being returned to Lakeview.

96. Even after that transfer, his records continued to describe him as obtunded, trach- and vent-dependent, difficult to wean from mechanical ventilation because of his severe anoxic brain injury, and dependent on medications to manage posturing, agitation, and autonomic dysregulation.

**Continued Pain, Sedation, and End-Stage Condition**

97. By February 2025, months after the ligature incident, Mr. Garcia remained in that profoundly impaired condition and was still requiring recurring doses of midazolam for post-hypoxic myoclonus and agitation, along with morphine for severe pain.

98. The medication administration record reflects repeated IV administration of midazolam and morphine, including entries documenting pain scores of 8 before morphine was given, followed by charting that the medication was effective.

99. These records show that Mr. Garcia did not simply survive the hanging, he endured months of severe neurological injury, recurrent agitation and spasms, invasive life-sustaining interventions, and pain requiring ongoing sedation and opioid treatment.

**Death and Autopsy Findings**

100. That course ultimately ended in his death. Mr. Garcia was pronounced dead on April 5, 2025, at 7:30 p.m.

101. The preliminary autopsy findings state that Mr. Garcia died from complications of anoxic brain injury reportedly due to suicidal hanging, after approximately eight months of unresponsiveness and respirator dependency.

102. The autopsy further notes that he died roughly two to three hours after withdrawal of respiratory support, consistent with the ligature event having initiated the cascade of brain injury, prolonged medical decline, and fatal complications that followed.

103. The final autopsy report determined that the cause of death was: "Complications of anoxic brain injury, due to remote suicidal hanging."

104. The autopsy further confirmed that the ligature used was a restraint tether, that the hanging occurred on July 19, 2024, and that Mr. Garcia remained in a state of prolonged unresponsiveness and respiratory dependency following the incident.

**Delayed Family Notification and DOC Restrictions**

105. On July 20, 2024, the day after the hanging, a UW Health social worker contacted CCI to identify a surrogate decision-maker for Mr. Garcia, who was unresponsive and unable to consent to his own care. A CCI captain responded that DOC policy was not to release any information about inmates to next of kin, including hospitalization, unless the inmate verbally authorized it. Because Mr. Garcia was unresponsive and could not give that authorization, CCI declined to notify anyone, and efforts to identify a surrogate decision-maker were delayed.

**Control of Evidence and Denial of Access**

106. The circumstances surrounding the timing, monitoring, and response to the ligature incident remain dependent on records and evidence maintained exclusively by Defendants.

107. Following the incident, requests for critical evidence, including video footage of the event, were denied by the Wisconsin Department of Corrections on the basis of institutional security concerns.

108. The denial of access to such evidence further reflects Defendants' control over and knowledge of the circumstances surrounding Mr. Garcia's death.

**DOC's Failure to Accommodate Mr. Garcia's Disability**

109. The events described above did not stem from a single lapse. Over the eleven days Mr. Garcia spent on clinical observation, DOC did not modify its standard observation practices to account for his known and escalating suicide risk. It kept him on the same observation level despite repeated self-harm. It did not complete the stabilization referral to the Wisconsin Resource Center that PSU staff had recommended exploring. It allowed him to be placed alone in an observation shower where a restraint tether remained within his reach.

## COUNT I - DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS (EIGHTH AMENDMENT) (42 U.S.C. § 1983) AGAINST DEFENDANTS DRAKE AND SPICE

110. Plaintiff hereby incorporates all preceding paragraphs as though fully set forth herein.

111. At all relevant times, Defendants Drake and Spice were employees and/or agents of the Wisconsin Department of Corrections and Columbia Correctional Institution, acting under color of state law and within the scope of their employment, including during each of their interactions with Mr. Garcia alleged in this Count.

112. Mr. Garcia had a serious medical need, namely a known and documented risk of suicide and self-harm, which constitutes a serious medical and mental health condition under the Eighth Amendment.

113. This serious medical need was longstanding and well-documented, including:

a. A prior suicide attempt by hanging on or about April 17, 2023 while housed at FLCI, in which Mr. Garcia tied a sheet around his neck and attempted to suspend himself;

b. Repeated expressions of suicidal ideation and threats of self-harm communicated to correctional, medical, and psychological staff;

c. Multiple incidents of self-harm behavior, including cutting and reopening wounds;

d. Placement on clinical observation status due to being "dangerous to self";

e. Mr. Garcia's July 16, 2024 statements to PSU staff that he wanted to die, was "absolutely capable of doing it," and wanted to "die quickly"; and

f. A same-day clinical assessment on July 19, 2024 documenting that Mr. Garcia's "acute risk to engage in self-directed violence remains elevated."

114. The Wisconsin Department of Corrections maintains centralized inmate records, including psychological, medical, and disciplinary records, that follow inmates between institutions. Mr. Garcia's FLCI history of suicide attempts and suicidal ideation was therefore available to Defendant Drake and other PSU staff at CCI.

115. Defendant Drake personally conducted Mr. Garcia's arrival safety assessment when he transferred to CCI on January 26, 2024, and was responsible for reviewing his history to assess his risk and determine appropriate monitoring.

116. Mr. Garcia's condition posed an obvious, substantial, and imminent risk of serious harm and death, requiring immediate and appropriate intervention, monitoring, and protection.

117. Once Mr. Garcia was found unresponsive with a tether tight around his neck, he had a second serious medical need: a life-threatening emergency requiring immediate release of the ligature, restoration of his breathing, and emergency medical care.

118. Defendants Drake and Spice each had actual knowledge of Mr. Garcia’s serious medical need and substantial risk of suicide, including through direct observation, clinical assessments, institutional records, staff communications, and explicit warnings of imminent self-harm.

119. On July 17 and again on the morning of July 19, 2024, Defendant Drake found that Mr. Garcia's acute suicide risk remained elevated. That afternoon, she heard someone threaten to hang himself. She then heard what sounded like the same voice coming from the shower where Mr. Garcia was alone.

120. Despite this knowledge, Defendant Drake did not have anyone look in on Mr. Garcia or direct a welfare check. She chose to wait until after his shower.

121. Defendant Spice, the assigned observation checker, knew Mr. Garcia was on suicide observation and had been taken to the shower. Upon information and belief, he also knew that someone had just threatened to hang himself.

122. Upon information and belief, Defendant Spice did not observe Mr. Garcia at the required fifteen-minute intervals while he was in the shower. No July 19 observation-check entries have been produced.

123. After Mr. Garcia was found, Defendant Spice refused a PSU psychologist's request to remove the tether and waited for a supervisor. Upon information and belief, he did not call for medical staff. The tether stayed tight around Mr. Garcia's neck until another staff member released it from outside the shower, at or after approximately 2:43 p.m.

124. These Defendants' acts and omissions include, but are not limited to:

a. Failing to implement adequate suicide precautions despite known risk;

b. Failing to escalate Mr. Garcia's observation status to a higher level of supervision, such as constant observation;

c. Failing to perform required observation protocols, including 15-minute staggered checks;

d. Allowing Mr. Garcia to remain unmonitored for a prolonged period of time, estimated to be approximately 40 minutes, while he was in the observation shower;

e. Failing to timely investigate or respond to warnings and statements that a PIOC intended to hang himself;

f. Failing to intervene promptly when signs of distress or danger were present, including refusing to remove the tether from an unresponsive Mr. Garcia and failing to summon medical staff; and

g. Failing to coordinate care between security, medical, and psychological staff to address Mr. Garcia's escalating condition.

125. These failures were not the result of mere negligence or inadvertence, but rather constituted reckless and conscious disregard for Mr. Garcia's known and substantial risk of suicide and his life-threatening medical emergency.

126. As a direct and proximate result of these Defendants' deliberate indifference:

a. Mr. Garcia was able to use a ligature (tether) while on suicide observation without being detected;

b. Mr. Garcia remained unmonitored long enough to hang himself;

c. The tether remained tight around Mr. Garcia's neck, and his breathing was not restored, for a prolonged period after he was found;

d. Mr. Garcia suffered severe oxygen deprivation and catastrophic anoxic brain injury;

e. Mr. Garcia remained in a compromised, unresponsive state for months; and

f. Mr. Garcia ultimately died as a result of complications from the hanging incident.

127. These Defendants' actions and omissions were a substantial factor in causing Mr. Garcia's injuries and death.

128. As a result of these Defendants' unconstitutional conduct, the Estate of Victor Garcia has suffered damages including, but not limited to:

a. Conscious pain and suffering experienced by Mr. Garcia prior to death;

b. Medical expenses and related damages;

c. Loss of life;

d. Emotional distress and damages recoverable under applicable law.

129. The conduct of Defendants Drake and Spice was willful, wanton, and in reckless disregard of Mr. Garcia's constitutional rights, entitling Plaintiff to punitive damages against each of them.

**COUNT II – FAILURE TO PROTECT FROM SELF-HARM (EIGHTH AMENDMENT) (42 U.S.C. § 1983) AGAINST DEFENDANTS DRAKE, SPICE, SAID, AND LATURI**

130. Plaintiff hereby incorporates all preceding paragraphs as though fully set forth herein.

131. At all relevant times, including during each of their interactions with Mr. Garcia alleged in this Count, Defendants Drake, Spice, Said, and Laturi were employees of DOC acting under color of state law and within the scope of their employment.

132. At all relevant times, Mr. Garcia faced a substantial and obvious risk of serious harm, including the risk of suicide and self-inflicted injury. The risk was not speculative or generalized, it was concrete, particularized, and known, and it required immediate and ongoing intervention.

133. Defendants Drake, Spice, Said, and Laturi had actual knowledge of this risk. Each knew Mr. Garcia was on clinical observation status because he was dangerous to himself. His history of suicidal behavior, including a prior attempt by hanging, was documented in DOC records.

134. In the days and hours leading up to the incident on July 19, 2024, Mr. Garcia had cut himself, repeatedly said he wanted to die, and remained on clinical observation as "dangerous to self." The risk was specific, imminent, and escalating.

135. On the morning of July 19, 2024, Defendant Drake conducted a clinical observation review and confirmed that Mr. Garcia's "acute risk to engage in self-directed violence remains elevated." Despite this express finding, Mr. Garcia was not placed on heightened observation or otherwise provided additional safeguards. A medical or custodial professional who recognizes a serious risk of self-harm cannot simply document the risk and then fail to take reasonable measures to abate it.

136. That afternoon, Defendant Drake and, upon information and belief, Defendant Spice heard someone in the observation unit yell that he was "going to hang" himself. That warning required immediate action to identify the source and ensure the safety of the inmates on observation.

137. Neither acted. Defendant Drake did not verify Mr. Garcia's condition or direct a welfare check. Upon information and belief, Defendant Spice did not look in on Mr. Garcia in the shower after the threat.

138. Defendants Said and Laturi further failed to protect Mr. Garcia by leaving a restraint tether fastened to the shower door, within his reach, while he was on clinical observation for suicide risk. The use and availability of such a ligature, particularly for an inmate with a known history of attempting hanging, created a substantial and foreseeable risk of serious harm. Permitting access to known instruments of self-harm for a suicidal inmate constitutes an obvious and unreasonable response to a known risk.

139. Upon information and belief, Defendant Said handled the tether during the escort and left it fastened to the shower door, and Defendant Laturi, who participated in the escort as the on-duty shift supervisor, saw or knew that the tether remained on the door and did not direct its removal. Defendant Laturi then left the observation area without ensuring that Mr. Garcia would be observed at the required intervals.

140. Defendant Spice also failed to conduct and document required observation checks. Mr. Garcia was required to be observed at intervals not to exceed fifteen (15) minutes, yet no observation-check entries for July 19, 2024 have been produced. Upon information and belief, Defendant Spice did not perform or document the required checks while Mr. Garcia was in the shower, disregarding a known and substantial risk of harm.

141. As a result, Defendants Drake and Spice allowed Mr. Garcia to remain in the observation shower undetected for approximately forty (40) minutes, as reported by staff and reflected in his medical records. Leaving a suicidal inmate unobserved for that long is not a reasonable response to a known risk of self-harm.

142. Even after Mr. Garcia was discovered, Defendant Spice failed to act promptly to remove the ligature. He refused to remove the tether until a supervisor arrived, delaying lifesaving intervention during an ongoing medical emergency.

143. Defendants' actions and omissions, including their failure to monitor Mr. Garcia, failure to respond to explicit warnings of self-harm, failure to remove access to ligature materials, and failure to intervene promptly once he was discovered, constituted a conscious disregard of a substantial risk of serious harm. Defendants did not merely fail to prevent harm, they failed to take reasonable, readily available measures in the face of a known and obvious danger, thereby satisfying the deliberate indifference standard under the Eighth Amendment.

144. As a direct and proximate result of Defendants' failure to protect Mr. Garcia from self-harm, Mr. Garcia suffered:

a. Catastrophic hypoxic-anoxic brain injury;

b. Prolonged neurological impairment;

c. Extreme physical and mental suffering; and

d. Ultimately death.

145. Defendants' conduct violated Mr. Garcia's rights under the Eighth Amendment to the United States Constitution, including his right to be free from cruel and unusual punishment and to be protected from known risks of serious harm while in custody.

146. The conduct of Defendants Drake, Spice, Said, and Laturi was willful, wanton, and in reckless disregard of Mr. Garcia's constitutional rights, entitling Plaintiff to punitive damages against each of them.

**COUNT III – UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT (FAILURE TO PROTECT FROM KNOWN SUICIDE HAZARDS) (EIGHTH AMENDMENT) (42 U.S.C. § 1983) AGAINST DEFENDANTS SAID AND LATURI**

147. Plaintiff hereby incorporates all preceding paragraphs as though fully set forth herein.

148. At all relevant times, including during Mr. Garcia's escort to, and placement in, the RH1 observation shower on July 19, 2024, Defendants Said and Laturi were employees of DOC acting under color of state law and within the scope of their employment.

149. On July 19, 2024, Defendants Said and Laturi were responsible for the care, custody, supervision, and safety of Victor Garcia during his escort to, and placement in, the RH1 observation shower at Columbia Correctional Institution.

150. The Eighth Amendment to the United States Constitution prohibits prison officials from subjecting individuals in their custody to conditions of confinement that pose an unreasonable risk of serious harm, including the risk of suicide.

151. At all relevant times, Mr. Garcia was known to Defendants Said and Laturi to be at a substantial risk of serious harm, including suicide.

152. Defendants Said and Laturi were aware that Mr. Garcia was on clinical observation status because he was "dangerous to self," and psychological assessments confirming that his risk of self-directed violence remained elevated.

153. Despite this knowledge, Defendants placed Mr. Garcia in conditions that presented a known and substantial risk of suicide.

154. Specifically, Defendants placed Mr. Garcia, alone, in an observation shower environment that contained a readily accessible ligature point and restraint device, a restraint tether left fastened to the shower door.

155. Defendants knew that such a restraint tether could be used as a ligature by an individual at risk of suicide, a risk obvious to any correctional officer or supervisor working in a suicide-observation unit.

156. Defendants Said and Laturi further failed to remove, restrict, or otherwise mitigate access to the tether or other potential ligature points despite Mr. Garcia's known suicide risk.

157. Defendants also failed to ensure that the observation shower environment was free from hazards that could be used for self-harm by individuals on clinical observation status.

158. At all relevant times, Defendants failed to implement adequate safeguards, supervision, and environmental controls to prevent Mr. Garcia from using the tether device to harm himself.

159. These failures occurred despite clear indicators that Mr. Garcia was at imminent risk of self-harm, including his placement on clinical observation status as dangerous to himself.

160. As a direct result of these unsafe conditions of confinement, Mr. Garcia was able to access the tether device, wrap it around his neck, and engage in a ligature hanging while in the observation shower.

161. Defendants' actions and omissions exposed Mr. Garcia to an unreasonable and substantial risk of serious harm that was obvious and well known.

162. Defendants were deliberately indifferent to this risk in that they knew of and disregarded a substantial risk to Mr. Garcia's health and safety.

163. As a direct and proximate result of Defendants' unconstitutional conduct:

a. Mr. Garcia suffered a ligature hanging;

b. Mr. Garcia sustained severe hypoxic-anoxic brain injury;

c. Mr. Garcia endured prolonged suffering and neurological impairment; and

d. Mr. Garcia ultimately died as a result of those injuries.

164. Defendants' conduct constitutes deliberate indifference in violation of the Eighth Amendment to the United States Constitution.

165. The conduct of Defendants Said and Laturi was willful, wanton, and in reckless disregard of Mr. Garcia's constitutional rights, entitling Plaintiff to punitive damages against each of them.

**COUNT IV – SUPERVISORY LIABILITY (FAILURE TO PROTECT FROM KNOWN SUICIDE RISK) (EIGHTH AMENDMENT) (42 U.S.C. § 1983) AGAINST DEFENDANT LATURI**

166. Plaintiff hereby incorporates all preceding paragraphs as though fully set forth herein.

167. At all relevant times, Defendant Laturi was a lieutenant (Supervising Officer 1) at CCI and, on July 19, 2024, the on-duty shift supervisor. He was an employee of the Wisconsin Department of Corrections, acting under color of state law and within the scope of his employment, including during each of his interactions with Mr. Garcia and with the staff responding to Mr. Garcia alleged in this Count.

168. At all relevant times, Defendant Laturi held a position of authority and responsibility for overseeing correctional staff, including the security staff working in RH1 and its clinical observation area, enforcing institutional policies, ensuring compliance with suicide-prevention protocols, and protecting inmates from known risks of serious harm, including self-harm and suicide.

169. Defendant Laturi is not liable under 42 U.S.C. § 1983 based solely on respondeat superior. He is liable in his individual capacity because he was personally involved in the constitutional violation, he knew of the conduct creating a substantial risk of serious harm to Mr. Garcia and facilitated, approved, condoned, or turned a blind eye to it.

170. At all relevant times, Victor Garcia faced a substantial, obvious, and imminent risk of serious harm, including suicide and self-inflicted injury.

171. This risk was known to Defendant Laturi, who knew of Mr. Garcia's placement on clinical observation status as "dangerous to self" as the shift supervisor who personally escorted Mr. Garcia out of his observation cell.

172. Defendant Laturi personally participated in the conduct that placed Mr. Garcia at risk. On July 19, 2024, he participated in the escort of Mr. Garcia from his observation cell to the RH1 observation shower. Upon information and belief, he saw or knew that the restraint tether used in the escort remained fastened to the shower door when the escort ended, and he did not direct that it be removed.

173. Upon information and belief, Defendant Laturi then left the observation area to take part in a cell extraction without ensuring that Mr. Garcia, whom he had just placed alone in a shower with a tether fastened to the door, would be observed at the required intervals.

174. Upon information and belief, as shift supervisor, Defendant Laturi was responsible for enforcing policies and procedures requiring, among other things, staggered observation checks at intervals not to exceed fifteen (15) minutes, immediate response to threats of self-harm, removal or restriction of access to ligature devices, and coordination between correctional, medical, and psychological staff.

175. Despite these obligations, Defendant Laturi failed to enforce compliance with these policies and procedures with respect to Mr. Garcia on July 19, 2024.

176. Upon information and belief, the absence of any observation check entries for July 19, 2024 reflects a failure to ensure that required monitoring was performed, demonstrating a breakdown in supervision and enforcement of critical safety protocols on Defendant Laturi's shift.

177. Defendant Laturi further allowed Mr. Garcia to remain unmonitored for an extended period of time, approximately forty (40) minutes, while in the observation shower, despite his known suicide risk.

178. At approximately 2:40 p.m., Defendant Laturi heard Defendant Spice's radio call for a supervisor to the observation area for an inmate engaging in self-harm. Defendant Laturi did not respond immediately. His own incident report does not reflect that he directed Defendant Spice to release the tether, sent another supervisor, or requested medical staff. Upon information and belief, he did none of these things, and the tether remained tight around Mr. Garcia's neck while Defendant Spice waited for a supervisor.

179. Defendant Laturi was deliberately indifferent to Mr. Garcia's constitutional rights by failing to act on information indicating that unconstitutional conduct was occurring, including knowledge of his suicide risk, knowledge that a tether remained fastened to the door of the shower in which Mr. Garcia had been placed, and knowledge that staff were requesting a supervisor to the observation area for an emergency.

180. Despite this knowledge, Defendant Laturi failed to take reasonable steps to prevent harm, including failing to order increased monitoring, failing to ensure proper

supervision of the observation area, failing to secure access to ligature devices, and failing to intervene in response to clear warning signs.

181. The acts and omissions of Defendant Laturi were a direct and proximate cause of Mr. Garcia's injuries and death.

182. As a direct and proximate result of Defendant Laturi's deliberate indifference, Mr. Garcia was not adequately monitored, retained access to a ligature device, was not timely discovered or rescued, suffered catastrophic hypoxic-anoxic brain injury, and ultimately died.

183. Defendant Laturi's conduct constituted deliberate indifference to a substantial risk of serious harm in violation of the Eighth Amendment to the United States Constitution.

184. As a result of Defendant Laturi's unconstitutional conduct, the Estate of Victor Garcia has suffered damages including, but not limited to, conscious pain and suffering prior to death, medical expenses, loss of life, and other damages recoverable under applicable law.

185. The conduct of Defendant Laturi was willful, wanton, and in reckless disregard of Mr. Garcia's constitutional rights, entitling Plaintiff to punitive damages against him.

## COUNT V – VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (FAILURE TO ACCOMMODATE MENTAL DISABILITY) (42 U.S.C. § 12132) AGAINST DEFENDANT WISCONSIN DEPARTMENT OF CORRECTIONS

186. Plaintiff hereby incorporates all preceding paragraphs as though fully set forth herein.

187. At all relevant times, Defendant Wisconsin Department of Corrections ("DOC") was a public entity within the meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131.

188. At all relevant times, Victor Garcia was a qualified individual with a disability as defined by the ADA. Mr. Garcia suffered from a serious mental health condition, including chronic suicidal ideation, repeated suicide attempts, and ongoing psychological instability, which substantially limited one or more major life activities, including thinking, concentrating, and caring for himself.

189. Mr. Garcia's mental health disability was well documented in DOC records, including incident reports, psychological service records, medical records, and observation status determinations, and was known to DOC.

190. As an individual in DOC custody, Mr. Garcia was entitled to the benefits of services, programs, and activities provided by DOC, including safe conditions of confinement, suicide prevention measures, clinical observation monitoring, mental health care, and coordinated responses to self-harm risks.

191. Title II of the ADA required DOC to provide Mr. Garcia with meaningful access to these services, programs, and activities and to make reasonable modifications to policies, practices, and procedures necessary to accommodate his known mental health disability.

192. Mr. Garcia required disability-related accommodations in the form of modified suicide-prevention measures, including but not limited to heightened monitoring, environmental safety controls, and coordinated intervention protocols tailored to his known and escalating suicide risk.

193. Despite this need, DOC failed to make reasonable modifications to its standard policies, practices, and procedures and instead subjected Mr. Garcia to unmodified and inadequate conditions that did not account for his mental health disability.

194. DOC's failure to accommodate Mr. Garcia's disability included, but was not limited to:

a. Failing to escalate Mr. Garcia's observation level to constant or heightened supervision despite repeated suicide attempts, active self-harm, and a same-day clinical determination that his suicide risk remained elevated;

b. Failing to modify standard suicide-watch procedures to ensure continuous or adequately frequent monitoring in light of his known and escalating risk, including failing to ensure compliance with required observation checks;

c. Failing to modify shower access and observation procedures for a suicidal inmate, including allowing Mr. Garcia to remain in an observation shower area without adequate monitoring or safeguards;

d. Failing to remove or restrict access to a known ligature device, including a restraint tether, despite Mr. Garcia's documented history of attempting suicide by hanging;

e. Failing to implement coordinated safety measures between correctional, medical, and psychological staff in response to Mr. Garcia's escalating suicide risk;

f. Failing to respond appropriately to explicit and imminent warnings of self-harm, including statements that an inmate in the observation unit was "going to hang" himself; and

g. Returning Mr. Garcia to the same unmodified observation conditions despite repeated incidents of self-harm and escalating risk, without implementing additional safeguards or accommodations.

195. These failures were not merely negligent acts or medical judgments, but constituted a failure to provide reasonable accommodations and modifications necessary to ensure Mr. Garcia's access to critical suicide-prevention services and safe conditions of confinement.

196. By failing to modify its policies and practices to account for Mr. Garcia's known mental health disability, DOC denied him meaningful access to services, programs, and activities, including adequate suicide monitoring, safe housing conditions, and appropriate mental health intervention.

197. DOC's conduct resulted in Mr. Garcia being subjected to the same unmodified conditions as non-disabled inmates, despite his need for heightened protections, thereby discriminating against him on the basis of his disability.

198. DOC acted with deliberate indifference to Mr. Garcia's federally protected rights. DOC had actual knowledge that harm to those rights was substantially likely, as evidenced by:

a. Mr. Garcia's extensive history of suicide attempts and self-harm;

b. His repeated expressions of suicidal ideation;

c. His placement on clinical observation status as "dangerous to self";

d. The July 19, 2024 clinical assessment confirming that his suicide risk remained elevated; and

e. Explicit warnings of imminent self-harm on the day of the incident.

199. Despite this knowledge, DOC failed to take reasonable steps to provide necessary accommodations or to prevent foreseeable harm.

200. As a direct and proximate result of DOC's failure to accommodate Mr. Garcia's disability:

a. Mr. Garcia was denied meaningful access to suicide-prevention services and safe conditions of confinement;

b. Mr. Garcia retained access to a ligature device while on suicide observation;

c. Mr. Garcia was not adequately monitored or protected during a critical period;

d. Mr. Garcia suffered a ligature hanging resulting in catastrophic hypoxic-anoxic brain injury;

e. Mr. Garcia endured prolonged suffering and neurological impairment; and

f. Mr. Garcia ultimately died from complications of that injury.

201. DOC's conduct constitutes discrimination on the basis of disability in violation of Title II of the Americans with Disabilities Act.

202. As a result, Plaintiff is entitled to all available relief under the ADA, including compensatory damages, costs, and attorneys' fees.

**COUNT VI – VIOLATION OF SECTION 504 OF THE REHABILITATION ACT (FAILURE TO ACCOMMODATE MENTAL DISABILITY) (29 U.S.C. § 794) AGAINST DEFENDANT WISCONSIN DEPARTMENT OF CORRECTIONS**

203. Plaintiff hereby incorporates all preceding paragraphs as though fully set forth herein.

204. At all relevant times, Defendant Wisconsin Department of Corrections ("DOC") was a public entity and a program or activity receiving federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

205. At all relevant times, Victor Garcia was a qualified individual with a disability as defined by the Rehabilitation Act. Mr. Garcia suffered from a serious mental health condition, including chronic suicidal ideation, repeated suicide attempts, and ongoing psychological instability, which substantially limited one or more major life activities, including thinking, concentrating, and caring for himself.

206. Mr. Garcia's disability was well documented in DOC records, including incident reports, psychological service records, medical records, and observation status determinations. DOC had actual knowledge of his disability, its severity, and its escalating nature.

207. As an individual in DOC custody, Mr. Garcia was entitled to the benefits of services, programs, and activities provided by DOC, including but not limited to: safe conditions of confinement, suicide prevention protocols, clinical observation monitoring, mental health care, and coordinated medical and psychological services.

208. Section 504 required DOC to provide Mr. Garcia with meaningful access to these services, programs, and activities and to make reasonable modifications to policies, practices, and procedures necessary to accommodate his known mental health disability and mitigate the substantial risk of self-harm.

209. DOC failed to provide reasonable accommodations to Mr. Garcia's known disability. These failures were systemic and included, but were not limited to:

a. Failing to escalate Mr. Garcia's observation level to constant or heightened supervision despite repeated suicide attempts, active self-harm, and a same-day clinical determination that his acute suicide risk remained elevated;

b. Failing to modify standard observation practices to ensure continuous or adequately frequent monitoring in light of his known and escalating risk;

c. Failing to remove or restrict access to a known ligature device, including a restraint tether, despite Mr. Garcia's documented history of attempting suicide by hanging;

d. Failing to modify shower and observation procedures to eliminate or mitigate known environmental suicide hazards for an inmate identified as dangerous to himself;

e. Failing to implement coordinated and responsive intervention protocols between security, medical, and psychological staff despite repeated indicators of imminent self-harm;

f. Failing to respond appropriately to explicit warnings of imminent suicide, including statements that an inmate in the observation unit was "going to hang" himself; and

g. Returning Mr. Garcia to the same observation conditions without meaningful modification despite repeated self-harm incidents and escalating risk.

210. These failures were not merely negligent medical judgments or isolated lapses in care. Rather, DOC failed to make reasonable accommodations and modifications to its policies, practices, and procedures to account for Mr. Garcia's known mental health disability, thereby denying him meaningful access to suicide prevention services and safe conditions of confinement.

211. By reason of his disability, Mr. Garcia required modified suicide-prevention measures, heightened monitoring, and environmental safeguards beyond standard observation protocols. DOC's failure to implement such accommodations resulted in Mr. Garcia being subjected to the same unmodified conditions that were inadequate and unsafe for an individual with his known disability.

212. As a direct result of DOC's failure to accommodate his disability, Mr. Garcia was denied the benefits of critical services, programs, and activities, including adequate suicide monitoring, safe housing conditions, and effective mental health intervention.

213. DOC acted with deliberate indifference to Mr. Garcia's federally protected rights. DOC had actual knowledge that harm to those rights was substantially likely, as evidenced by:

   a. Mr. Garcia's extensive history of suicide attempts, including prior attempts by hanging;

   b. His repeated expressions of suicidal ideation and active self-harm behavior;

   c. His placement on clinical observation status as "dangerous to self";

   d. The July 19, 2024 clinical assessment confirming that his suicide risk remained elevated; and

   e. Explicit warnings of imminent self-harm on the day of the incident.

214. Despite this knowledge, DOC failed to take reasonable steps to provide necessary accommodations or to prevent the foreseeable harm.

215. As a direct and proximate result of DOC's violations of the Rehabilitation Act:

   a. Mr. Garcia was left without adequate accommodations for his mental health disability;

   b. Mr. Garcia was able to access a ligature device while on suicide observation;

   c. Mr. Garcia was not adequately monitored or protected during a critical period;

   d. Mr. Garcia suffered a ligature hanging resulting in catastrophic hypoxic-anoxic brain injury;

e. Mr. Garcia endured prolonged suffering, neurological impairment, and invasive medical intervention; and

f. Mr. Garcia ultimately died from complications of that injury.

216. DOC's conduct constitutes discrimination on the basis of disability in violation of Section 504 of the Rehabilitation Act.

217. As a result, Plaintiff is entitled to all relief available under the Rehabilitation Act, including compensatory damages, costs, attorneys' fees, and all other relief deemed just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for the following reliefs:

(a) A judgment in favor of Plaintiff and against Defendants on all Counts of this Complaint;

(b) An award of compensatory damages against the Individual Defendants under 42 U.S.C. § 1983 (Counts I–IV) and against the Wisconsin Department of Corrections under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act (Counts V–VI), jointly and severally where applicable, including but not limited to damages for Mr. Garcia's conscious pain and suffering, emotional distress, loss of life, and all other damages permitted by law;

(c) An award of economic damages, including medical, funeral, and burial expenses and all other pecuniary losses sustained as a result of Defendants' conduct;

(d) A finding that each Individual Defendant was acting within the scope of his or her employment with the Wisconsin Department of Corrections at all times relevant to this action, for purposes of Wis. Stat. § 895.46;

(e) An award of punitive damages against the individual Defendants in their individual capacities under 42 U.S.C. § 1983 for their willful, wanton, and reckless disregard of Mr. Garcia's constitutional rights;

(f) An award of compensatory damages under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, based on the Wisconsin Department of Corrections' deliberate indifference to Mr. Garcia's federally protected rights;

(g) An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a;

(h) An award of prejudgment and post-judgment interest as allowed by law;

(i) Such other and further legal and equitable relief as the Court deems just, proper, and equitable under the circumstances.

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY.**

Dated this 13th day of October 2026.

**The LaMarr Firm, PLLC**

By: /s/ B'Ivory LaMarr
B'Ivory LaMarr, Bar No. 1122469
3355 Lenox Rd, Suite 200
Atlanta, GA 30326
Phone: (800) 679-4600 ext. 700
Email: blamarr@bivorylamarr.com

**Dane Royce Law Firm, LLC**

Dane Royce Dixon Bar No. 5889027
3355 Lenox Rd, Suite 200
Atlanta, GA 30326
Phone (404) 905-8047
Email: drd@daneroycelaw.com

Attorneys for Plaintiff